## ARCHIE L. GIRARD ET AL.
*vs.*
## MINNIE KABATZNICK, ADMX.
(Estate of Jacob Kabatznick) et al.

Superior Court     New Haven County     File No. 58411

MEMORANDUM FILED MAY 27, 1941.

*William F. Jones, Jr.,* and *Vincent A. Miller,* of Thomaston, and *Watrous, Gumbart & Corbin,* of New Haven, for the Plaintiffs.

*Martin E. Gormley,* of New Haven, for the Defendant (The Great Atlantic & Pacific Tea Co.).

*Bronson, Lewis, Bronson & Upson,* of Waterbury, and *Israel Poliner,* of Middletown, for the Defendants, Kabatznick.

BALDWIN, J.   This action was brought by the named plaintiff to recover damages resulting from injuries caused by a fall on the 18th day of February, 1939, in an elevator shaft in a building owned by the estate of Jacob Kabatznick, and located at the corner of Main and Rapallo Streets in the City of Middletown.

The named plaintiff was an employee of the Simmons Company, a Delaware corporation, located in New Haven, which corporation has paid compensation to its employee under our compensation laws and has therefore intervened as a party plaintiff.

Upon the conclusion of the plaintiff's case, upon motion, Minnie Kabatznick, who was a defendant in her individual capacity, was granted judgment of nonsuit.

The building in which the elevator and its shaft are located is a three-story building with a basement.  The elevator and shaft are at the rear of the building and run from the basement to the third story, the machinery operating the elevator being located in a small enclosure on the roof of the building.

A portion of the basement, a portion of the ground or main floor running along Rapallo Street, and the second and third floors are occupied by the owner of the building, the Estate of Jacob Kabatznick, and it conducts therein its furniture business.

The remaining portions of the basement and of the ground or main floor are occupied by the defendant, The Great Atlantic & Pacific Tea Company, under a lease for a term of three years from June 1, 1938 to May 31, 1941, with privilege of seven successive yearly renewals.

The tea company conducts a general merchandising business in its store on the main floor, which has a front of 53 feet and a depth of 100 feet and it occupies for storage purposes approximately 1,800 square feet of the basement floor under its lease, this space being partitioned off from that occupied by the owner, the Kabatznick Estate.

On the basement floor on three sides of the elevator shaft a space is partitioned off from the rest of the basement floor space for common use by the Kabatznick Furniture Company and the tea company. The other side of the elevator shaft is the rear wall of the building.

The elevator shaft is at the rear of the building, and where it extends through the main floor it is within the area occupied by the tea company under its lease. From the main floor there is a passway which runs alongside of the elevator to an enclosure attached to the rear of the building, which passway provides a direct rear entrance to and exit from that part of the main floor occupied by the tea company. As one enters the main floor through this rear passway the elevator shaft is upon his left.

The enclosure referred to is a brick structure. While it is not included in the description of the premises described in the lease, a part of the space within the enclosure is occupied by the tea company for storage purposes and some of its empty crates, cases and cartons go out through this enclosure, the floor of which is the ground and is slightly lower than the main floor of the store of the tea company.

Within this enclosure along the outside of the main building there is a platform nine feet long, four and one-half feet wide, and approximately three and one-half feet high. It is, approximately, three feet higher than the level of the main floor. A door, sliding to the left, as one stands on the platform facing it, opens into the elevator shaft.

This enclosure, platform, door, elevator and shaft are arranged so that a truck may back into the enclosure and up to the platform for the purpose of loading or unloading merchandise, and the enclosure, platform and elevator are in frequent daily use by the furniture company since it is the only practical available way or means for receiving and shipping its merchandise. This enclosure is also used by the furniture company as a garage in which to house its truck overnight.

This enclosure, platform, door, elevator and shaft as a way or means for receiving or shipping its merchandise is very rarely used by the tea company. The entrance to the enclosure from the outside is through a door which is of insufficient size to admit into the enclosure the large trucks that deliver merchandise to this company. As a way through which merchandise is received by the tea company this rear entrance has been used but two or three times and those times were shortly after it first occupied the premises, when it was found impossible to admit the large trucks employed in delivering merchandise to the tea company into the enclosure and also otherwise inconvenient. On these occasions it did not appear whether the platform and elevator were used.

The passway from the main floor to the enclosure is the much more convenient means of a rear entrance to or exit from that floor. To the basement for the receipt or shipping of heavy or bulky merchandise, the platform and elevator is the more convenient when the rear entrance is used by the tea company, provided trucks are used that can be admitted into the enclosure.

The front entrance to the store of the tea company is the entrance commonly used for receipt and delivery of its merchandise. At this entrance is a wide sidewalk substantially level with the store floor. At this entrance merchandise is received and by the use of hand trucks such merchandise as may be placed on the shelves of the store is there placed and the remainder is conveyed back to the elevator and by use of the elevator conveyed to the basement.

The elevator is also used at times on which to carry merchandise by the tea company from the basement to the main floor. This use is usually in the morning and usually before the furniture company has opened for business, as the tea company's hour for opening business is earlier than that of the furniture company.

Occasionally during the hours of the day the tea company may have need of use of the elevator to convey merchandise from the basement to the store floor. In such event it will seek permission for such use from the furniture company or some of its employees.

The lease includes no reference to the elevator or to its use

by the tea company, except as the word "appurtenance" is used in the lease.

The mechanism and power operating the elevator are under the control of the furniture company and the cost of the power operating it is paid for by the furniture company, as is also all cost of repairs to the elevator and to the shaft and all entrances thereto. The furniture company has a contract with the Otis Elevator Company providing for inspection, servicing and repairs, and the expense of such inspection, servicing and repairs the furniture company alone pays. The elevator is registered in the Labor Department of the State as that of the furniture company. Its use by the tea company is merely incidental and a permissive use. Its control is solely in the furniture company. There is no intention disclosed in the lease or otherwise to part with any control by the furniture company or to assume any control by the tea company of the elevator or its shaft or any entrance to the shaft.

The elevator shaft is entirely enclosed and doors are provided at the basement and each of the other three floors and at the loading platform in the enclosure. These doors are designed to be closed and locked and not capable of opening from the outside of the shaft unless the elevator is at a level with the floor from which the door opens.

On the 19th day of February, 1939, the day on which the plaintiff was injured, the elevator was, and for a long time had been in a defective condition and it could be operated without the door to the shaft at the loading platform and at the second floor being closed.

During the forenoon of that day an employee of the furniture company had used the elevator on occasions to convey merchandise from an upper floor, or floors, to the platform to be loaded into its truck for deliveries and had also used the elevator to convey merchandise from the platform to one of its floors.

Very shortly before noon this employee had backed the truck of the furniture company into the enclosure and he left it there with the rear end of the truck against the platform. He went upon the platform and into the elevator and ascended to the second floor where he left the elevator and went to his dinner.

When he entered the elevator and ascended he left the sliding platform door to the shaft open some six or eight or nine inches. Very shortly after noon the plaintiff, Gerard, making a delivery to the furniture company, for the plaintiff, Simmons Company, of a double bed spring mattress, which the furniture company had bought from the Simmons Company, drove his truck to the rear of the building, unloaded the mattress, and working it edgewise end over end, he moved it in the enclosure and along through a narrow passage between the right side of the furniture company's truck and a lot of empty cases, boxes and cartons piled along the inside of the wall of the enclosure and placed it up on the platform.

This left insufficient room for him to get up on the platform on that side of the truck so he passed around in front of the truck and along the left side of it to the door to the rear entrance to the tea company store. Opening this door and entering, he observed that it was a grocery store and everybody was busy; he returned and climbed upon the platform and observing the door somewhat open and thinking that it opened into a receiving room for merchandise, he pushed it a little more open and stepping forward fell into the shaft to its bottom, a distance of a little over 15 feet.

The day was clear and of good light outside. Within the enclosure it was quite dark, there being no windows in its walls. Such light as entered came through a small skylight in the roof that was not far above the top of the covered body of the truck standing in the enclosure and also such light as entered through the open door to the enclosure and passed back through the narrow passages on each side of the truck. With the truck standing in the position in which it stood and the materials on each side of it, the platform and the doorway to the shaft were rendered quite dark.

There were electric light fixtures with bulbs therein maintained by the furniture company and by the tea company in this enclosure, but they were not illuminated and, coming into this darkened place from the sunlight, Girard's vision had not become accommodated to the darkened condition as he came upon the platform close to the partly open door to the elevator shaft.

There was no sign attached to the elevator shaft or to the door or thereabouts, nor was there any other condition or

thing thereabouts designed to or that would give warning of the presence of the elevator shaft and the dangerous condition resulting from its presence.

Girard was an invitee and lawfully upon the premises at the time. A person is regarded as an invitee where he enters the premises or a particular portion thereof to deliver merchandise purchased by the owner or occupant. 45 C.J. Negligence §220, and cases cited.

In *Bunnell vs. Waterbury Hospital*, 103 Conn. 520, at page 525 (131 Atl. 501), considering the question of negligence of the defendant, the court said: "To invite the decedent into this cloak-room, where defendant maintained an unlocked door to an elevator shaft on the third floor of a building, with no sign or warning upon this door or in this room to prevent users of the room from opening the door, and with no sufficient light in the room to enable him to anticipate from the character of the door that it was the entrance to an elevator shaft, was clearly negligence, as the complaint alleges. The defendant contests the issue of negligence, but we think it is so clear against the defendant, when once the decedent is found to have been rightfully in the room and looking for a toilet upon the implied invitation of the defendant, that we do not esteem it necessary to further discuss this conclusion." And the court proceeded: "The only other contested issue upon this branch of the case is that the decedent's own negligence materially contributed to his injuries. In passing upon this point, we start with the decedent rightfully in this room and rightfully approaching this door and intent upon opening it for the object of his search. His negligence, if any, consisted not in opening the door, but in not looking after he had opened the door and before he had stepped across its threshold, with the dim light behind him and the darkness of the elevator shaft in front of him. His course of conduct must be judged as the circumstances would then appear to a reasonable man. There is no sign of warning on or about the door; it is unlocked; it opens into the elevator shaft. A partial step, the foot upon the sill as the door is opened, the balance lost, even a little, and the fall is inevitable. The decedent opens the door and falls in. The test of the conduct of the decedent is that of the ordinary man under the same circumstances."

In *Rhodius vs. Johnson*, 24 Ind. App. 401, 56 N.E. 942, Cora Johnson, the appellee, sued the appellants for damages

because of injuries sustained in a fall in an elevator shaft on premises owned by the appellant Rhodius, and leased by her to the appellant Emminger, and recovered. The appellee was an invitee in the building in which the elevator was located, entrance to which was had through a long hall off from which a door opened to the elevator shaft, the door swinging into the hall. This door was open about a foot or 18 inches and the hall was so poorly lighted that the open door to the elevator shaft did not disclose what sort of a place it opened into. The appellee entered the hall through an outside door, having come from bright sunlight into a comparatively dark hall. As she, with her sister and another, came into the hall she saw, well along in the hall, this door somewhat open and thinking that it opened into a room she said to her sister, "Let us go and sit down" and opening the door somewhat more she stepped into the elevator shaft and was injured. The court said (p. 410 of 24 Ind. App.):

"In view of the fact that the general verdict involved the finding that appellee was free from fault contributing to her injury, and that appellants were guilty of negligence, can we say that only one inference can be reasonably drawn from the foregoing facts, which are undisputed, and that inference that she was negligent, or not exercising the care which would, under the circumstances, have been used by an ordinarily prudent person?

"The question to be determined from the evidence is whether appellee was proceeding as an ordinarily prudent person would have proceeded under the circumstances. The open doorway, if not an invitation to enter, was certainly not a warning of danger. What is due care must depend upon circumstances. As stated in McRickard vs. Flint, 114 N.Y. 222, the facts in which case were very much like those in the case at bar, McRickard attempted to enter the manufactory of the defendant, and seeing a door partly open, entered it, and fell down an elevator way. The court said: 'If the plaintiff had stopped and looked about when he entered the door, he evidently would have seen the situation. Because he failed to do this it is contended that he was necessarily chargeable with contributory negligence. The plaintiff probably did not stop after he proceeded to enter. . . . It was the duty of the plaintiff to exercise reasonable care, and to take observation of that which was apparent to view as he proceeded. But what is due care

and diligence depends upon circumstances. The same precau-
tionary means requisite to relieve a party from the charge of
negligence when he approaches known places of danger, or
places where danger may be apprehended, may not be required
of him when he has no occasion to suppose that danger may
be encountered. It cannot be said that the plaintiff upon this
occasion was required to apprehend that there might be an
exposed elevator pit in the place where he entered. The fact
that the door was partly opened enabled him to suppose it
was a suitable place of entry, so that the question is whether
not seeing it was necessarily negligence on his part. That is
not so, unless he was required to stop and take careful obser-
vation of the place when he entered upon the threshold, and
before he proceeded further to enter the room....This ques-
tion of contributory negligence may be considered in view of
the influences which ordinarily control human action. That is
to some extent governed by appearances, and is not always the
consequences of failure to exercise the greatest prudence or to
make use of the best judgment. Here the plaintiff in step-
ping into the room, the first step he took after his entry onto
the threshold at a partially open door, received the injury from
a cause which he had no apparent reason to expect and which
he failed to see until too late to avoid the calamity. And the
fact that the difference in time between his entrance into the
room and his fall was only momentary is a circumstance bear-
ing upon his opportunity to see the danger and probably may
have had some consideration upon the question of contributory
negligence. The conclusion of the jury that he was free from
that imputation was permitted by the evidence.' "

In *Tousey vs. Roberts,* 114 N.Y. 312, 21 N.E. 399, the ele-
vator causing the injury was in the hallway at such a point
that it was a disputed fact whether or not at the time of the
injury an artificial light was necessary. The elevator door
was opened by a boy, and the plaintiff failing to observe that
the car was not in place, stepped in, and was injured. The
court said (p. 316 of 114 N.Y.): "It was not, as a matter
of law, contributory negligence in the plaintiff to pass through
the door without stopping to look and listen. An elevator
....is not....supposed to be a place of danger, to be ap-
proached with great caution; but, on the contrary, it may be
assumed, when the door is thrown open by an attendant, to
be a place which may be safely entered without stopping to
look, listen or make a special examination."

In the instant case, like the cases referred to, the door to the elevator shaft was not opened in the presence of Girard. It was left open before Girard came upon the scene by an employee of the Kabatznick Furniture Company, who left the elevator at the floor above. Girard entered the door of a darkened shed or enclosure about 20 feet from the elevator shaft and made his way alongside of the parked truck, climbed upon the loading platform where he was but a step or two from the elevator shaft and seeing a door partially open, opened it a little more and entered what he supposed was a receiving and shipping room and fell into an elevator shaft. In the absence of gates, guards, lights, signs or other warnings of danger, he was entitled to assume that he would not be exposed to such danger, and his failure to take extraordinary or special precautions is not contributory negligence. *Rhodius vs. Johnson; Tousey vs. Roberts, supra.*

"A landlord who rents different parts of his building to various tenants, reserving the elevators, halls, stairways or other approaches for the common use of his tenants, is under an implied duty to keep such spaces in a reasonably safe condition, and is liable for injuries to persons lawfully in the building." *Mueller vs. Phelps,* 252 Ill. 630, 633, 97 N.E. 228, 230. See, also, 9 R.C.L. *Elevators* §16.

In *Follins vs. Dill,* 221 Mass. 93, 108 N.E. 929, A leased from the defendant the third floor of a six-story building with the exception of the staircases and the elevator wells. The lease provided for use by the tenant of the freight elevator for freight purposes only and that the tenant would allow no person to ride on it. It also included a covenant that "the lessee will defend any law suit and pay any claim or damage arising from any accident or accidents to any person, persons or property in consequence of his occupancy of the herein leased premises." Plaintiff's intestate came to the tenant's place of business to get some freight. He rode up to the third floor on the freight elevator and finding no freight returned to the elevator shaft to descend. Upon arrival at the third floor he had pushed up the elevator gate and left the elevator at that floor. Upon his return to the elevator shaft the gate was still up and assuming that the elevator was still there, the place being somewhat dark, he stepped forward and fell into the elevator shaft and was injured.

The elevator gates were not lifted automatically. They de-

scended into place protecting the elevator well automatically, when properly working, upon removing the elevator from any floor at which they had been raised. The gate at the third floor was in bad condition, remaining up at times when it should have dropped to the floor after the elevator had left the landing place. This condition was due to the fact that the runways of the gate were not properly lubricated, work which should have been done by the defendant. The court said (p. 98 of 221 Mass.): "This was enough to warrant a finding of negligence on the part of the defendant, provided he owed a duty to the plaintiff greater than that which he would owe to a licensee or a trespasser." The defendant contended that the clause in the lease to the effect that the demised premises included "The third floor with the exception of the staircases and the elevator wells....vested control of the elevator gates in the tenant." The court said (p. 98 of 221 Mass.): "But this is not a fair construction of the lease. The gates were so connected with the elevator that express and definite stipulation would be required to place responsibility for their care upon a tenant when the elevators remained in care of the landlord."

In *Cussen vs. Weeks,* 232 Mass. 563, 122 N.E. 757, plaintiff's intestate, an employee of the lessee of the second floor of the building, fell when he leaned slightly against the gate at the elevator opening and looked up, when almost instantly the gate gave way and left its guards and swung out into the elevator well and plaintiff's intestate fell to the bottom of the well.

The lease included "the use of steam heat and the freight elevator (for freight only), during ordinary business hours, in common with the other tenants." At page 565 of 232 Mass., the court said: "When the lease is read in the light of the plans and other evidence, it seems clear that the landing gate and the runs connected therewith were not a part of the demised premises, but were retained under the control of the defendants. And such is the practical construction of the lease which the defendants adopted and acted upon when they repaired the elevator gate and its appliances, both before and after the accident."

In *Olson vs. Schultz,* 67 Minn. 494, 70 N.W. 779, the defendant was the owner of a four-story building with a base-

ment. He leased the fourth story to the plaintiff with the privileges and appurtenances thereunto belonging for the term of one year. The third floor was unoccupied. The remainder of the building was occupied by another tenant who had equal right to use an elevator in the building with Olson. The elevator ran from the basement to the top floor. Olson used the elevator in connection with his business conducted on the fourth floor in carrying freight. The lease included a provision that: "The lessor is to keep the elevator and approaches in constant repair, and in perfect condition for the lessee's use", etc. (the remaining provision is not material to our consideration). The elevator was defective and it fell, causing an injury to an employee of Olson who sued Olson and recovered. Olson when sued notified the defendant and requested him to defend. Schultz refused to defend. Upon judgment against Olson he sued Schultz and recovered. The court said (p. 499 of 67 Minn.): "The only control or possession which plaintiff had over the elevator was that his operator might stand upon the platform while operating it in carrying plaintiff's merchandise. The other tenants had the same right. So far as appears from the record, the entire machinery connected with the operation of the elevator was under the management and in the possession and under the control of the defendant. The premises designated in the lease as those rented are 'the fourth floor of the four-story brick building known as being numbers 121 and 123 Washington Avenue North.' The elevator was not leased to Olson, but only its mere use during such time as he needed it to convey his merchandise either up or down. At other times the North Star Boot & Shoe Company or the defendant had a right to its use. Olson's control of the elevator was a mere easement or right to transport his goods back and forth as his necessities occasionally required. . . .

"As the defendant was the owner of the building and elevator, and the third story was not rented, the presumption is that he had the absolute control and possession of the elevator at all times, subject only to the tenant's right of carrying goods as above indicated. Hence he had the legal right and the actual opportunity to make all necessary repairs and keep the elevator and its machinery in perfect condition, irrespective of the covenant and reserved privileges in the lease to do so. Olson had no right and was under no legal obligation to repair the elevator. He had no right to go to the basement or other

stories for the purpose of repairing it, nor, as against other tenants, to stop its running for such purpose.

"His right to its use was not exclusive."

In *Lander vs. Hornbeck*, 74 Okla. 239, 179 Pac. 21, the plaintiffs in error, Lander et al., had in their possession and under their control as executors of an estate, a five-story building which was used and occupied by various tenants. The fifth floor was leased to a tenant who used two or three rooms for a dwelling; in the balance of this floor the tenant conducted a dance hall, which was so used each week day evening. All of the tenants used a common stairway and an elevator which was under the control of the landlord and was operated by him from early morn until approximately 6 o'clock in the evening of each week day when the elevator was generally left at the fifth floor for the permissive use for the fifth floor tenant for the rest of the day. This tenant employed an operator who came on duty about 8 o'clock in the evening and remained until midnight. Power for the operation of the elevator was furnished by the landlord. This elevator was accessible and it was operated by other tenants after the operator employed by the landlord had ceased his work.

On a Sunday evening, Hornbeck (the defendant in error) visited the fifth floor tenant, who brought the elevator to the first floor and then conducted the guest to the fifth floor where the elevator was left. After visiting they decided to attend a show. Hornbeck and others started through a poorly lighted hall to the elevator and when they reached the entrance to the elevator, the door of which was open, Hornbeck stepped into the shaft and fell to the first floor and was injured.

The court said (p. 239 of 74 Okla.) that this tenant "was accustomed to use it [the elevator] for the comfort of her family and guests during the time no operators were in charge and on Sundays, and her use at all times may be said to have been permissive, and not contractual, as she could have been denied it and no rights of contract violated, and other tenants might have used it without interfering with her contractual rights." The court further said (p. 241 of 74 Okla.) : "Applying the rule best supported by the authorities, we must hold that in cases of this character, where negligence is shown to exist that is the proximate cause of the injury, the landlord may be held liable unless the elevator is in the absolute control of the tenant."

The elevator was under the control of the defendant Estate of Jacob Kabatznick and it was the negligence of this defendant that was the substantial factor in causing the injuries that Girard suffered, which injuries were not materially contributed to by any negligence of Girard.

The plaintiff Girard received very serious injuries which are permanent and has suffered severe pain and will continue to suffer pain, and because of the permanent character of his injuries his opportunities of employment are restricted.

The plaintiff Simmons Company, under the Compensation Act, has paid on account of these injuries $1,590.01 for medical and hospital treatment and $1,462.50 compensation and is liable under the Act, for a reasonable attorney's fee amounting to $650.

Judgment may enter for the plaintiffs to recover from the defendant Estate of Jacob Kabatznick $14,500 damages and judgment may enter in favor of the defendant The Great Atlantic & Pacific Tea Company. Of these damages the judgment shall provide that the plaintiff, the Simmons Company, shall recover from the defendant Estate of Jacob Kabatznick $3,702.51, and the plaintiff Archie Girard shall recover from the defendant Estate of Jacob Kabatznick $10,797.49.